# Exhibit E

This Opinion is Not a Precedent of the TTAB

Mailed: November 6, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*FremantleMedia North America, Inc.*
*v.*
*Kids Got Talent*

———

Opposition No. 91275600

———

Michael J. Salvatore, Steven M. Weinberg and Eric S. Fram of Holmes Weinberg, PC for FremantleMedia North America, Inc.

Kids Got Talent, pro se.

———

Before Lykos, Thurmon and Allard, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

Kids Got Talent ("Applicant") seeks to register on the Principal Register the composite mark displayed below for "Conducting entertainment exhibitions in the nature of a national talent showcase and television show production featuring dancers, artists, models, acrobats, poets, bands, celebrities, and musicians" in International Class 41:[1]

---

[1] Application Serial No. 90576410, filed March 12, 2021, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), alleging April 16, 2016 as the date of first use anywhere and in commerce. The description of the mark is as follows: "The mark consists of the phrase 'KIDS GOT TALENT' with the word 'KIDS' in red with a black outline, the word 'GOT' is in blue

FremantleMedia North America, Inc ("Opposer") opposes registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), alleging prior common law rights in, and "exclusive" ownership, of the registered standard character mark AMERICA'S GOT TALENT for "Entertainment services in the nature of an ongoing television talent show; entertainment services, namely, providing an on-line computer game" and "live stage shows" in International Class 41.[2]

---

with a black outline, the word 'TALENT' is in black with a yellow and blue outline, and a yellow star outlined in blue is located behind the word 'GOT.'" The colors red, blue, black and yellow are claimed as a feature of the mark.

Citations to the record throughout the decision include references to TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. *See, e.g.*, *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Citations to the prosecution file of the opposed application refer to the USPTO's Trademark Status & Document Retrieval ("TSDR") system. Portions of the Board record are confidential. We have cited to the redacted, publicly available versions and otherwise refer to confidential portions of the record only in general terms as necessary to support our determination.

[2] Notice of Opposition ¶¶ 2-7; 1 TTABVUE 4-5 (pleading exclusive ownership of Registration Nos. 3350449 and 4059779).

In its Answer to Notice of Opposition, Applicant denied the salient allegations of the Notice of Opposition, and asserted various affirmative and putative defenses (i.e., amplifications of its denials).[3]

The case is fully briefed.[4] Opposer, as plaintiff in this proceeding, bears the burden of establishing its entitlement to a statutory cause of action and substantive claim by a preponderance of the evidence. *See Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1107 (TTAB 2007). In reaching our decision, we have not considered any statements made by either party in their briefs that are unsupported by evidence properly in the record. *See, e.g.*, *Saul Zaentz Co. v. Bumb*, 95 USPQ2d 1723, 1725 n.7 (TTAB 2010).

## I. The Record

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), Applicant's application file.

---

[3] Answer at 5 TTABVUE. Applicant's First, Second and Third Affirmative Defenses of laches, waiver and acquiescence were not pursued and are therefore waived. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.,* 107 USPQ2d 1750, 1753 (TTAB 2013) (respondent's affirmative defense of failure to state a claim not argued in brief deemed waived), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014) (mem.). Applicant's Fourth and Fifth Affirmative Defenses are not true affirmative defenses but rather amplifications of Opposer's denials. *See id.*

[4] Applicant's brief does not conform with the formatting requirements set forth in Trademark Rule 2.126(b)(1), 37 C.F.R. § 2.126(b)(1), because the font size is less than 11-point type. Nonetheless, because the brief clearly is less than the 55 page limitation, it has been considered.

Neither Opposer nor Applicant used the recommended citation practice to record evidence in their respective briefs which is to cite to the evidence in the trial record by referencing the TTABVUE entry **and page number**. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 801.01 (2024); *see also Turdin*, 109 USPQ2d at 1476 n.6 (recommended citation to the Board's TTABVUE docket electronic database by the entry and page number (e.g., 1 TTABVUE 2)).

A. Opposer's Main Trial Period

Opposer submitted the Testimony Declaration of Tim Grau, Executive Vice President, Business and Legal Affairs, of Opposer FremantleMedia North America, Inc. ("Grau Decl.") with exhibits (21 TTABVUE - confidential version; 22 TTABVUE - publicly available version).

Opposer also submitted notices of reliance on the following (23-30 TTABVUE):[5]

> Copies of Opposer's pleaded trademark Registration Nos. 3350449 and 4059779 printed from the Trademark Electronic Search System ("TESS") and their corresponding printout from the USPTO's Trademark Assignment Abstract of Title (23 TTABVUE);[6]
>
> Printouts from Opposer's social media platforms Facebook and Instagram; WIKIPEDIA entries for "America's Got Talent" and "Got Talent"; YouTube screenshot of "America's Got Talent" (24 TTABVUE);
>
> Printouts from the Visit LasVegas, Luxor MGM Resorts and NBC websites (25 TTABVUE);
>
> Applicant's Responses to Opposer's First Set of Requests for Admission and First Set of Interrogatories (26 TTABVUE);
>
> Printouts from Applicant's website kidsgottalent.org and Instagram page (28 TTABVUE);
>
> WIKIPEDIA entry for "Luxor Las Vegas" (29 TTABVUE);

---

[5] Opposer argues in its brief that it and "its affiliates" have used the mark KIDS GOT TALENT. Opposer's Brief, p. 13; 38 TTABVUE 14. Opposer did not plead ownership and use of the mark KIDS GOT TALENT in the Notice of Opposition. Nor was this issue tried by implied consent under Fed. R. Civ. P. 15(b)(2). For this reason, we have not considered any evidence of Opposer's use of the mark KIDS GOT TALENT at 27 TTABVUE or elsewhere in the record in our decision. Likewise, we have not considered any evidence pertaining to Opposer's unpleaded Registration No. 6646040 for the trademark AGT.

[6] The USPTO retired the TESS database on November 30, 2023.

Dictionary.com entries for "America" and search results for the phrase "got talent" and "kids." (30 TTABVUE).

B. Applicant's Trial Period[7]

Applicant submitted the Testimony Declaration of its President, Sky Coffee ("Coffee Decl.") (31 TTABVUE). Applicant did not submit any evidence under notice of reliance.

C. Opposer's Rebuttal Trial Period

Opposer submitted the Rebuttal Testimony Declaration of Tim Grau ("Grau Rebuttal Decl.") (36 TTABVUE). Opposer introduced under a notice of reliance the WIKIPEDIA entry for "Bianca Ryan" (34 TTABVUE) and search results for the phrase "got talent" from the online versions of THE MERRIAM-WEBSTER DICTIONARY, THE OXFORD ENGLISH DICTIONARY and COLLINS DICTIONARY (35 TTABVUE).

## II. Opposer's Evidentiary Objections

Opposer asserts the following evidentiary objections in its main trial brief which we address below.[8]

---

[7] Applicant's submission of its pretrial disclosures during its trial period was improper. *See* 32 and 33 TTABVUE. Applicant was required to serve pretrial disclosures on Opposer fifteen days prior to the opening of its assigned trial period. *See* Trademark Rule 2.121(e), 37 C.F.R. § 2.121(e).

[8] Opposer's Brief, pp. 4-8; 38 TTABVUE 5-9. The Board in its order denying Opposer's motion for summary judgment advised Applicant to obtain legal counsel familiar with litigation before the TTAB. 20 TTABVUE 8. Applicant assumed the responsibility and risk of deciding to represent itself. *See Hole In 1 Drinks, Inc. v. Lajtay*, 2020 USPQ2d 10020, at *1 (TTAB 2020); *see also Yanopoulos v. Dep't of Navy*, 796 F.2d 468, 470 (Fed. Cir. 1986) ("Petitioner chose to proceed pro se and must accept the consequences of that decision.").

A. Web Hyperlinks in the Coffee Testimony Declaration

Opposer objects to all evidence purportedly introduced via web hyperlinks in Paragraph Nos. 12-13, 22-25 embedded in the Testimony Declaration of Applicant's President, Sky Coffee.[9]

The objection is sustained. Providing only a web address or a hyperlink without the website printout attached as an exhibit along with the access date and URL is insufficient to make the evidence of record. Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e). *See, e.g., Chutter, Inc. v. Great Mgmt. Grp., LLC*, 2021 USPQ2d 1001, at *32 n.67 (TTAB 2021) (article and accompanying video referenced by hyperlink inadmissible), *rev'd and remanded on other grounds*, *Great Concepts, LLC v. Chutter, Inc.*, 90 F.4th 1333, 2023 USPQ2d 1215 (Fed. Cir. 2023).

B. Statements made by Destiny Alvater

Opposer objects to statements allegedly made by Destiny Alvater in Paragraph Nos. 14, 16, 22, and 24-25 of Coffee's Testimony Declaration "purportedly approving of Applicant, wanting to cooperate with Applicant, reaching out to Applicant, wanting to partner with Applicant, wanting to utilize Applicant's services, or otherwise contacting or communicating with Applicant" as inadmissible hearsay under Fed. R. Evid. 801 and 802. The objection is sustained as inadmissible hearsay for the reasons stated by Opposer.

[9] 31 TTABVUE 4, 6-8.

C. Paragraph No. 15 of the Coffee Testimony Declaration

Opposer objects to the statements made in Paragraph No. 15 of the Coffee Testimony Declaration that "Applicant does not need Opposer's written authorization or approval to register KIDS GOT TALENT," and "that the services and trade channels are not an issue, and are not overlapping and legally identical."[10]

The objection is sustained. The Board does not consider opinion testimony regarding the ultimate disposition of a claim. *See, e.g., Pierce-Arrow Soc'y v. Spintek Filtration, Inc.*, 2019 USPQ2d 471774, at *2 (TTAB 2019) (sustaining objection to portion of testimony declaration where witness opined on the ultimate disposition of the claim).

D. Paragraph No. 24 of the Coffee Testimony Declaration

Opposer objects to the statements made in Paragraph No. 24 of the Coffee Testimony Declaration that GOT TALENT is a common phrase that is listed in the dictionary for lack of foundation since no evidence has been introduced in support of these statements, and impermissible lay opinion testimony under Fed. R. Evid. 801. The objection is sustained on the ground of lack of foundation for the reasons stated by Opposer.

E. Paragraph No. 29 of the Coffee Testimony Declaration

Opposer objects to the statements made in Paragraph No. 29 of the Coffee Testimony Declaration opining that KIDS GOT TALENT is not likely to cause

[10] 31 TTABVUE 5.

confusion, mistake, or deception as impermissible lay opinion testimony under Fed. R. Evid. 801. The objection is sustained. *See, e.g., Pierce-Arrow Soc'y,* 2019 USPQ2d at *2 (sustaining objection to portion of declaration opinion testimony beyond witness' area of expertise and where witness opined on the ultimate disposition of the claim).

F. Exhibits A.1 and A.2 to the Coffee Testimony Declaration

Opposer objects to the two documents included as "Exhibit A.1" and "Exhibit A.2" to the Coffee Testimony Declaration on the grounds that these documents are irrelevant and lack evidentiary value because the fact that an application has been approved by the USPTO for publication has no effect in a subsequent opposition to that application. Opposer is correct to the extent that an examining attorney's actions have no preclusive effect on the issue of likelihood of confusion in an inter partes proceeding. Nonetheless, we see no basis for striking the documents from the record because the Board is able to assess their probative value. The objection is therefore overruled.

## III. Entitlement to a Statutory Cause of Action

An opposer in any inter partes case before the Board must prove its entitlement to a statutory cause of action. *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015). Section 13 of the Trademark Act, 15 U.S.C. § 1063(a), states:

> Any person who believes that he would be damaged by the registration of a mark upon the principal register, … may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor, within thirty days after the publication under

> subsection (a) of section 1062 of this title of the mark sought to be registered.

To establish entitlement to a statutory cause of action under Section 13 of the Trademark Act, Opposer must demonstrate (1) that its claims fall within the zone of interests protected by the statute (i.e., has a "real interest" in the outcome of the proceeding); and (2) damage proximately caused by the proposed registration (i.e., a reasonable basis for its belief in damage). *See Meenaxi Enter., Inc. v. Coca-Cola Co.*, 2022 USPQ2d 602, at *2 (Fed. Cir. 2022) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014)); *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *4-8 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *Empresa,* 111 USPQ2d 1162; *see also Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999) (defining a "real interest" as a "direct and personal stake" in the outcome of the proceeding).

As discussed in more detail below, Opposer's witness, Tim Grau, Executive Vice President, Business and Legal Affairs, through his testimony declaration and related exhibits, has established Opposer's common law rights in, and use of, the mark "America's got Talent" as displayed below



in connection with "a reality television talent contest featuring singers, dancers, magicians, comedians, and other performers of all ages, including kids who compete for a prize by performing in front of four judges through multiple rounds of eliminations."[11] We find that Opposer has an interest falling within the zone of interests protected by Section 13 of the Trademark Act and a reasonable belief in damage proximately caused by the proposed registration of Applicant's mark for the services identified therein. *See Giersch v. Scripps Networks, Inc.,* 90 USPQ2d 1020, 1022 (TTAB 2009) (common-law use sufficient to establish standing).

## IV. Trademark Act Section 2(d) Claim

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), prohibits the registration of a mark that

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods [or services] of the applicant, to cause confusion, or to cause mistake, or to deceive.

We consider each element of this claim, priority and likelihood of confusion, below.

### A. Priority

Opposer must first prove by a preponderance of the evidence that it owns "a mark registered in the Patent and Trademark Office or a mark or trade name previously

[11] Grau Decl. ¶ 3 and Ex. A; 22 TTABVUE 2-3 and 15.

used in the United States … and not abandoned ….” Trademark Act Section 2(d), 15 U.S.C. § 1052(d).

In the Notice of Opposition, Opposer pleaded “exclusive” ownership of Registration Nos. 3350449 and 4059779 for the standard character mark “America’s got Talent” for “Entertainment services in the nature of an ongoing television talent show; entertainment services, namely, providing an on-line computer game” and “live stage shows” in International Class 41.[12] The evidence presented at trial, however, shows that Opposer, FremantleMedia North America, Inc, now co-owns both registrations with Star Receivables Limited.[13] Since Opposer no longer exclusively owns the registrations, it cannot rely on the registrations to prove priority, but must instead rely on its pleaded common law rights.[14]

The involved application was filed under Trademark Act Section 1(a) on March 12, 2021, meaning that Applicant may rely on the application’s filing date as the constructive use date. *See Syngenta Crop Protection, Inc. v. Bio-Chek, LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009); *Levi Strauss & Co. v. R. Josephs Sportswear Inc.,* 36 USPQ2d 1328, 1332 (TTAB 1994) (an application filing date for a use-based

---

[12] Notice of Opposition ¶¶ 2 and 3; 1 TTABVUE 4-5 (pleading exclusive ownership of Registration Nos. 3350449 and 4059779).

[13] Grau Decl. ¶¶ 24-25 and Ex. B (printouts from Trademark Assignment Abstract of Title showing assignment recorded on March 14, 2023 at Reel 8024/Frame 0803); 22 TTABVUE 10-11; 23 and 29.

[14] Nothing precludes the filing of an opposition when two or more parties may have an interest in a mark. *See Avia Grp. Int’l Inc. v. Faraut,* 25 USPQ2d 1625, 1627 (TTAB 1992) (respondent’s motion to dismiss and its alternative motion to join petitioner’s parent as owner of pleaded registrations and real party in interest denied since issue concerned what rights petitioner has in pleaded marks vis-à-vis respondent, not anyone else).

application can establish first use of a mark). An applicant may, however, prove an earlier date of first use in commerce. Applicant's President Sky Coffee testified that "[i]n 2016, I formed KIDS GOT TALENT," "a talent show that gives aspiring youth (Singers, Dancers, Musicians, Models, Actors and Spoken Word Poets) ages (4-19) the opportunity to showcase their [t]alents in front of [m]ajor [r]ecord [l]abels, A & Rs, Choreographers, Talent/Agencies/Managers and TV Execs."[15] She further testified that KIDS GOT TALENT "is one of the largest independent talent shows in the South;" that "kids from across the nation have journeyed to Atlanta, Georgia for the opportunity to compete in the massive Annual Kids Got Talent competition;"[16] and that Applicant has "advertised and promoted the KIDS GOT TALENT mark since 2016, on all social media platforms, words of mouth, radio ads, television podcasts, flyers, merchandise and also through influencers and celebrities."[17] Opposer did not elect to take oral cross-examination of Applicant's sole witness.

We find based on the unchallenged testimony declaration of Applicant's President Sky Coffee that Applicant has established common law rights in its applied-for mark through evidence of actual use in commerce as of 2016.[18] *Cf. Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965) ("Oral testimony, if sufficiently probative, is normally satisfactory to establish priority of

---

[15] Coffee Decl. ¶ 2; 31 TTABVUE 2. *See also* Coffee Decl. ¶ 11; 31 TTABVUE 3-4.

[16] Coffee Decl. ¶ 5; 31 TTABVUE 3.

[17] Coffee Decl. ¶ 10; 31 TTABVUE 3.

[18] To the extent, if any, Applicant now takes the position in its brief that its date of first use in commerce is 1999, none of Applicant's statements are supported by the record evidence.

use in a trademark proceeding"); *Nat'l Bank Book Co. v. Leather Crafted Prods., Inc.,* 218 USPQ 826, 828 (TTAB 1993) (oral testimony may be sufficient to prove the first use of a party's mark when it is based on personal knowledge, it is clear and convincing, and it has not be contradicted); *Liqwacon Corp. v. Browning-Ferris Industries, Inc.,* 203 USPQ 305, 316 (TTAB 1979) (oral testimony may be sufficient to establish both prior use and continuous use when the testimony is proffered by a witness with knowledge of the facts and the testimony is clear, convincing, consistent, and sufficiently circumstantial to convince the Board of its probative value); *GAF Corp. v. Anatox Analytical Servs., Inc.,* 192 USPQ 576, 577 (TTAB 1976) (oral testimony may establish prior use when the testimony is clear, consistent, convincing, and uncontradicted). Opposer must therefore demonstrate ownership and common law rights in its pleaded common law "America's got Talent" mark prior to this date by a preponderance of the evidence. *See Giersch v. Scripps,* 90 USPQ2d at 1023. *See also Otto Roth & Co. v. Universal Foods Corp*., 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981). *See also Embarcadero Techs., Inc. v. RStudio, Inc.,* 105 USPQ2d 1825, 1834 (TTAB 2013) (citing *Hydro-Dynamics Inc. v. George Putnam & Co. Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987)).

Opposer's Executive Vice President, Business and Legal Affairs, Tim Grau, testified that all statements made in his testimony declaration are based either upon personal knowledge or review of Opposer's business records.[19] Based on this

[19] Grau Decl. ¶ 1; 22 TTABVUE 2. *See also id.* at ¶ 3; 22 TTABVUE 4 ("Over the course of my employment with Fremantle, I have become personally knowledgeable about the marketing, ratings, and viewership of the AMERICA'S GOT TALENT® television series since its launch, and our extensive AMERICA'S GOT TALENT® licensing business. I have acquired this

averment, we find that Opposer's witness has the necessary personal knowledge and foundation to testify as to the subjects set forth in the testimony declaration. According to his declaration testimony:[20]

> 3. AMERICA'S GOT TALENT® is a reality television talent contest featuring singers, dancers, magicians, comedians, and other performers of all ages, including kids, who compete for a prize by performing in front of four judges through multiple rounds of eliminations. In later rounds of the contest, performers are eliminated and a winner is ultimately chosen by members of the studio and home audience, who cast votes for their favorite performers.
>
> …
>
> 5. AMERICA'S GOT TALENT® premiered on the NBC television network on June 21, 2006, and has aired on NBC each year since that time.
>
> 6. AMERICA'S GOT TALENT® wrapped its eighteenth season on September 27, 2023. Each and every broadcast of the AMERICA'S GOT TALENT® television series prominently features the AMERICA'S GOT TALENT® mark on-screen, so that it is viewable both by millions of television viewers, as well as by studio audiences.
>
> …
>
> 10. The NBC network and its respective affiliates have regularly advertised and promoted the AMERICA'S GOT TALENT® mark during the series' 18-season run, since its introduction in 2006, including through nationwide television ads on NBC. All of these ads prominently feature the AMERICA'S GOT TALENT® mark.

---

knowledge both from reviewing the business records of the company as well as from my involvement in the marketing and business affairs of this very popular television series and its related businesses.").

[20] 22 TTABVUE 2-4.

The best illustrations of Opposer's use of its pleaded mark common law mark are included in Exhibit 1 to the Grau Declaration where the mark appears in the context of "co-promotion and sponsorship campaigns" with corporate sponsors Universal Studios and Sonic:[21]




[21] Grau Decl. ¶ 21 and Ex. 1; 22 TTABVUE 9, 13 and 15 (screenshots from Opposer's internal archives).




Grau has laid the proper foundation to authenticate these screenshots based on his personal knowledge, meaning that the screenshots to his testimony declaration do not constitute hearsay and are corroborating evidence of priority. *Compare Coca-Cola Co. v. Meenaxi Enter., Inc.*, 2021 USPQ2d 709, at *11 (TTAB 2021) (without accompanying testimony, Wayback Machine evidence generally is admissible only for what it shows on its face), *reversed on other grounds*, *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 2022 USPQ2d 602 (Fed. Cir. 2022); *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1041 (TTAB 2018) (webpages submitted under notice of reliance generally cannot be used to demonstrate priority without corroborating testimony).

Applicant did not avail itself of the opportunity to take oral cross-examination of Opposer's sole witness. We find that Opposer, through the unchallenged testimony

declaration of Grau and documentary evidence, commenced use in interstate commerce of its pleaded common law mark displayed below

on June 21, 2006 in connection with "a reality television talent contest featuring singers, dancers, magicians, comedians, and other performers of all ages, including kids who compete for a prize by performing in front of four judges through multiple rounds of eliminations" with its premiere on the NBC television network.[22] Opposer has therefore established proprietary rights its mark prior to Applicant's constructive and actual dates of first use by a preponderance of the evidence.

B. Likelihood of Confusion

We turn to the second element of Opposer's Section 2(d) claim, likelihood of confusion. Our analysis is based on all of the probative evidence of record. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"), cited in *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 113 USPQ2d 2045, 2049 (2015). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In making our determination, the Board has considered each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying

[22] Grau Decl. ¶ 3 and Ex. A; 22 TTABVUE 2-3 and 15.

weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Cap. City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination.").

"Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde,* 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the [services] and differences in the marks."). These factors, and the other *DuPont* factors argued by each party, are discussed below.

1. The Similarity or Dissimilarity of the Marks

We commence with the first *DuPont* factor which involves an analysis of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed Cir. 2005) (citing *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd per curiam*, 777 F. App'x 516 (Fed. Cir. 2019)

(citing *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)); *accord Krim-Ko Corp. v. Coca-Cola Bottling Co.,* 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (citation omitted).

"Similarity is not a binary factor but is a matter of degree." *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1062 (Fed. Cir. 2003)). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.,* 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012)). Further, the marks "must be considered ... in light of the fallibility of memory ..." *In re St. Helena Hosp.*, 113 USPQ2d at 1085 (quotation omitted). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *In re Bay State Brewing Co., Inc.,* 117 USPQ2d 1958, 1960 (TTAB 2016) (citing *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd per curiam*, 972 F.2d 1353 (Fed. Cir. 1992)).

Because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, the analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire

marks, not just part of the marks. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *In re Nat'l Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). "No element of a mark is ignored simply because it is less dominant, or would not have trademark significance if used alone." *In re Electrolyte Labs. Inc.,* 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990) (citing *Spice Islands, Inc. v. Frank Tea & Spice Co.,* 505 F.2d 1293, 184 USPQ 35 (CCPA 1974)). "On the other hand, in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." *Nat'l Data Corp.,* 224 USPQ at 751.

Marks based on common law rights are defined by their actual use. As noted above, Opposer's common law mark is used in the form ; Applicant has applied to register the composite mark . Both marks are comprised of wording and design elements meaning that greater weight is often given to the wording, because it is the wording that purchasers would use to refer to

or request the goods or services. *See, e.g.*, *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012); *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *41-42 (TTAB 2022) (quoting *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at *31 (TTAB 2021)).

The literal portion of each parties' marks, KIDS GOT TALENT and "America's got Talent," are both unitary phrases because the initial words KIDS and "America's" do not create a commercial impression separate and apart from the literal elements of the marks as a whole; that is, "America's" and KIDS are so integrated into their respective marks as part of a phrase that they cannot be regarded as separable. *See Dena Corp. v. Belvedere Int'l, Inc.*, 950 F.2d 1555, 21 USPQ2d 1047, 1052 (Fed. Cir. 1991) (finding EUROPEAN FORMULA and design for cosmetic products not unitary since the "elements are not so merged together that they cannot be regarded as separate" and the proximity of the words to the design feature "does not endow the whole with a single, integrated, and distinct commercial impression."); *In re EBS Data Processing*, 212 USPQ 964, 966 (TTAB 1981); *In re Kraft, Inc.*, 218 USPQ 571, 573 (TTAB 1983).

While the first term in a mark generally is considered to be the feature which will be called for, and so remembered, by consumers, this is not invariably the case. *Stone Lion*, 110 USPQ2d at 1161 ("the Board did not err in finding that 'STONE LION CAPITAL' is 'similar in sight, sound, meaning, and overall commercial impression' to 'LION CAPITAL' and 'LION.'"); *Chatam Int'l*, 71 USPQ2d at 1946 ("Viewed in their entireties with non-dominant features appropriately discounted, the marks

[GASPAR'S ALE for beer and ale and JOSE GASPAR GOLD for tequila] become nearly identical."). The literal portions of each party's mark has the same structure. With the exception of the initial words "America's" and KIDS, Applicant's and Registrant's marks are the same since they end with the same two words GOT TALENT. This makes the marks similar in sound and appearance, especially since they each incorporate a star design.

Applicant argues that the marks differ in connotation and commercial impression because "KIDS GOT TALENT explicitly highlight[s] its focus on children's talents whereas America's Got Talent is a broader talent show featuring performers of all ages."[23] Even when the wording is slightly different, if the marks convey the same idea, meaning or commercial impression, they are confusingly similar. *See, e.g., Proctor & Gamble Co. v. Conway*, 419 F.2d 1332, 164 USPQ 301, 304 (CCPA 1970) (holding MISTER STAIN likely to be confused with MR. CLEAN on cleaning products); *In re M. Serman & Co.*, 223 USPQ 52, 53 (TTAB 1984) (holding CITY WOMAN for ladies' blouses likely to be confused with CITY GIRL for a variety of female clothing); *H. Sichel Sohne, GmbH v. John Gross & Co.*, 204 USPQ 257, 260-61 (TTAB 1979) (holding BLUE NUN for wines likely to be confused with BLUE CHAPEL for the same goods). Such is the case here where consumers are likely to recognize both phrases as referring to individuals with a particular talent.

In addition, given the similarities between the marks, consumers familiar with Opposer's common law mark "America's got Talent" are likely to perceive Applicant's

---

[23] Applicant's Brief, 39 TTABVUE 2.

mark KIDS GOT TALENT as a variant mark denoting a spinoff televised talent show featuring children. *See Double Coin Holdings, Ltd. v. Tru Dev.*, 2019 USPQ2d 3373409 at *7 (TTAB 2019) ("Here, ROAD WARRIOR [for tires] looks, sounds, and conveys the impression of being a line extension of WARRIOR."); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1271 (TTAB 2009) (VANTAGE TITAN "more likely to be considered another product from the previously anonymous source of TITAN medical diagnostic apparatus, namely, medical ultrasound devices"); *Schieffelin & Co. v. Molson Cos., Ltd.*, 9 USPQ2d 2069, 2073 (TTAB 1989) ("Those consumers who do recognize the differences in the marks may believe that applicant's mark is a variation of opposer's mark that opposer has adopted for use on a different product.").

We therefore find that the marks are similar in sound, appearance, connotation and commercial impression. Accordingly, the first *DuPont* factor weighs in favor of finding a likelihood of confusion.

2. The Services

The second *DuPont* factor "considers whether the consuming public may perceive the respective [services] of the parties as related enough to cause confusion about the source or origin of the [ ]." *Naterra Int'l, Inc. v. Bensalem*, 92 F.4th 1113, 2024 USPQ2d 293 at *2 (Fed. Cir. 2024) (citation omitted)).

Applicant's services are defined by the language recited in the application. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1052 (Fed. Cir. 2018); *Stone Lion*, 110 USPQ2d at 1162; *see also Octocom Sys. Inc. v. Houston Computers Servs.*

*Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Opposer's common law rights are based on the actual services for which it actually uses its mark.

Applicant's services are identified as "conducting entertainment exhibitions in the nature of a national talent showcase and television show production featuring dancers, artists, models, acrobats, poets, bands, celebrities, and musicians." The identification is devoid of any age limitations on participants meaning that it necessarily encompasses both children and adults. *Cf. In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'").

Opposer's witness testified that Opposer provides "a reality television talent contest featuring singers, dancers, magicians, comedians, and other performers **of all ages, including kids**, who compete for a prize by performing in front of four judges through multiple rounds of eliminations. In later rounds of the contest, performers are eliminated and a winner is ultimately chosen by members of the studio and home audience, who cast votes for their favorite performers."[24] This evidence shows that the parties' services overlap, and are identical-in-part, meaning that the second *DuPont* factor weighs heavily in favor of finding a likelihood of confusion.

3. The Established, Likely-to-Continue Channels of Trade and Classes of Consumers

Next we consider the third *DuPont* factor, the established, likely-to-continue

[24] Grau Decl. ¶ 3; 22 TTABVUE 2-3 (emphasis added).

channels of trade and classes of consumers. We first look to how the trade channels are delineated, if at all, in the application. *See Stone Lion*, 110 USPQ2d at 1161; *see also Octocom,* 16 USPQ2d at 1787. According to the identification of services, Applicant's talent show services are rendered via television. The identification is not limited to any specific television platform (e.g., network, pay-per-view, subscription, cable etc.) meaning that it includes all platforms.

Because Opposer's prior common law rights are based on its use, we look to the record evidence to determine the trade channels Opposer uses. The Grau Testimony Declaration and accompanying documentary evidence show that Opposer offers its talent show services via the NBC television network.[25] As such, the established, likely to continue trade channels are the same.

This brings us to the classes of consumers. The application is not limited to any specific group of television viewers seeking to watch talent competitions, whether by age or any other demographic. Based on the testimony and evidence describing the nature of Opposer's services, it is clear that Opposer's viewership also consists of the television watching general public seeking to view talent competitions.[26] We therefore find that Applicant's and Opposer's talent show services are marketed in the same established, likely-to-continue channels of trade and to the same classes of consumers. Thus, the third *DuPont* factor weighs in favor of finding a likelihood of

[25] Grau Decl. ¶ 3; 22 TTABVUE 2-3.

[26] Grau Decl. ¶ 15; 22 TTABVUE 6 ("[T]he winner of the AMERICA'S GOT TALENT® competition ultimately is chosen through votes from our studio and television audiences.").

confusion.

4. Purchasing Conditions

"The fourth *DuPont* factor considers '[t]he conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing.'" *Stone Lion,* 110 USPQ2d at 1162 (quoting *DuPont*, 177 USPQ at 567). A heightened degree of care when making a purchasing decision may tend to minimize likelihood of confusion. *See, e.g., In re N.A.D., Inc.,* 754 F.2d 996, 224 USPQ 969, 971 (Fed. Cir. 1985) (because only sophisticated purchasers exercising great care would purchase the relevant goods, there would be no likelihood of confusion merely because of the similarity between the marks NARCO and NARKOMED). Conversely, impulse purchases of inexpensive items may tend to have the opposite effect. *Palm Bay*, 73 USPQ2d at 1695.

The involved application does not include any restrictions regarding how viewers watch KIDS GOT TALENT televised talent competitions. We must therefore assume that Applicant's televised talent competitions air on network television as well as paid subscriptions. The evidence shows that Opposer's "America's got Talent" common law mark airs on network television, which does not require a paid subscription.

The decision to watch a television program "might well be made on impulse" and thus is not a "sophisticated" decision. *Parfums de Coeur, Ltd. v. Lory Lazarus*, 83 USPQ2d 1012, at *10 (TTAB 2007). Ordinary consumers are likely to exercise only ordinary care, especially given that we may presume that Applicant's television shows are available for free and not paid subscription. Likewise, the record shows

that Opposer's television shows are broadcast on NBC. *See Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000) ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care.").

Focusing on the least sophisticated potential customers which in this case consists of members of the general public seeking to watch talent shows on network television, we find that the fourth *DuPont* factor weighs in favor of a likelihood of confusion. *See Stone Lion*, 110 USPQ2d at 1163 ("Although the services recited in the application also encompass sophisticated investors, Board precedent requires the decision to be based 'on the least sophisticated potential purchasers.").

5. Commercial Strength/Fame of Opposer's Common Law Mark

We now direct our attention to the commercial strength or fame of Opposer's common law mark under the fifth *DuPont* factor as argued by Opposer. Commercial strength or fame is the extent to which a significant portion of the relevant public recognizes a mark as denoting a single source. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017).

The commercial strength or fame of a mark is not a binary "all-or-nothing" factor in the context of a likelihood of confusion analysis. *Joseph Phelps Vineyards,* 122 USPQ2d at 1734. Rather, likelihood of confusion fame "varies along a spectrum from very strong to very weak." *See Palm Bay*, 73 USPQ2d at 1694 (internal citation omitted). Famous marks "enjoy wide latitude of legal protection" and are "more attractive as targets for would-be copyists." *Id.* Fame for likelihood of confusion

purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *Id.*

A mark falling on the higher end of the fame spectrum has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot,* 54 USPQ2d at 1897; *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). A high degree of fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark falls on the higher end of the commercial strength of fame spectrum to clearly prove it. *Coach Servs.,* 101 USPQ2d at 1720 (internal quotation marks and citation omitted) (citing *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007)).

Commercial strength or fame may be measured not only directly by consumer surveys or declarations but also indirectly by the volume of sales and advertising expenditures in connection with the goods or services sold under the mark, and supported by other indicia such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; the general reputation of the goods or services; and social media presence. *Weider Publ'ns, LLC v. D & D Beauty Care Co.,* 109 USPQ2d 1347, 1354

(TTAB 2014), *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014); *see also Bose*, 63 USPQ2d at 1308 (recognizing indirect evidence as appropriate proof of strength); *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) (finding petitioner's evidence of commercial strength included unsolicited media coverage); *ProQuest Info. and Learning Co. v. Island*, 83 USPQ2d 1351, 1358 (TTAB 2007) (finding widespread unsolicited media is probative of fame). The proper legal standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers and potential customers of a product or service, and not the general public." *Joseph Phelps Vineyards,* 122 USPQ2d at 1734.

Opposer's televised talent competition "America's got Talent" premiered in 2006 on the NBC television network and has aired on NBC each year since that time.[27] The statistics on viewership are impressive. Since its debut, "America's got Talent" averages 6.9–15.8 million viewers per season; during its fifteenth through eighteenth seasons, which aired between 2020 and 2023, average viewership was 6.9–8.5 million viewers per season.[28] Between 2020 and 2023, "America's got Talent" was the number one primetime show among total viewers on 85 of its broadcast nights.[29] "America's got Talent" has garnered consistently high Nielson ratings, with as many as 3.9% of all U.S. television viewers tuning in to "America's got Talent" broadcasts between

[27] Grau Decl. ¶ 5; 22 TTABVUE 3.

[28] Grau Decl. ¶ 7; 22 TTABVUE 3.

[29] Grau Decl. ¶ 8; 22 TTABVUE 4.

2020 and 2023.[30] Each broadcast prominently features the mark on-screen, so that it is viewable both by these millions of television viewers, as well as by studio audiences.[31]

Equally impressive, "America's got Talent" enjoys a vibrant social media following amassing over 26 million subscribers and over 4.4 billion channel views on its YouTube channel alone.[32] *See New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *12 (TTAB 2020) (evidence of likelihood of confusion fame included opposer's social media presence on Facebook, YouTube, Twitter and Instagram). "America's got Talent" has garnered over 22 million followers on its official Facebook page, 11.2 million followers and over 165 million likes on its official TikTok account, and over 3.1 million followers on its Instagram page.[33] *See id.* From January 1, 2019 through October 27, 2023 alone, there were over twenty billion views of "America's got Talent" branded videos across YouTube, Facebook, Instagram, and TikTok.[34] Between the beginning of season 18 on May 30, 2023, and its finale on September 27, 2023, there were 2.9 billion new video views, 7.4 million net new followers, and over 114 million interactions, such as a like, comment, or follow, across the YouTube, Facebook, Instagram, and TikTok accounts.[35]

---

[30] Grau Decl. ¶ 8; 22 TTABVUE 4.

[31] Grau Decl. ¶ 6; 22 TTABVUE 3.

[32] Grau Decl. ¶ 11; 22 TTABVUE 5.

[33] Grau Decl. ¶ 11; 22 TTABVUE 5.

[34] Grau Decl. ¶ 12; 22 TTABVUE 5.

[35] Grau Decl. ¶ 14; 22 TTABVUE 6.

Opposer has participated in numerous co-branding promotional campaigns featuring the "America's got Talent" mark including recent campaigns with SONIC restaurants, CHIPS AHOY! cookies, and various kid-focused films, including "Trolls Band Together," "Paws of Fury," "Despicable Me 3," "My Little Pony," "The Grinch," and "Secret Life of Pets 2."[36] Such marketing efforts further raise consumer recognition of Opposer's mark.

Opposer's "America's got Talent" television show has received numerous awards and accolades, including Nickelodeon's KIDS' CHOICE AWARDS for "Favorite Reality Show" in 2017, 2019, 2020, 2021, and 2022, as well as a TEEN CHOICE AWARD for "Choice Reality TV Show" in 2019, and a PEOPLE'S CHOICE AWARD for "Favorite TV Competition Show" in 2019.[37]

Based on this evidence, we find that Opposer has established that its common law mark used in connection with "a reality television talent contest featuring singers, dancers, magicians, comedians, and other performers of all ages, including kids who compete for a prize by performing in front of four judges through multiple rounds of eliminations" falls on the high end of the fame/commercial strength spectrum "from very strong to very weak," *Joseph Phelps Vineyards*, 122 USPQ2d at 1734, amongst a "significant portion of the relevant U.S. consumers," *Palm Bay*, 73 USPQ2d at 1694, viewers of all ages seeking to watch televised talent

---

[36] Grau Decl. ¶ 21; 22 TTABVUE 9.

[37] Grau Decl. ¶ 23; 22 TTABVUE 10.

competitions. The extraordinary level of the mark's fame means that it is entitled to a broad scope of protection. *See Kenner Parker Toys,* 22 USPQ2d at 1459 ("A mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark."). The fifth *DuPont* factor weighs heavily in favor of finding a likelihood of confusion.

6. Weakness of Opposer's Common Law Mark

"[T]he sixth *DuPont* '[t]he number and nature of similar marks in use on similar goods,' *DuPont*, 177 USPQ at 567, [ ] is a measure of the extent to which other marks weaken the assessed mark." *Spireon, Inc. v. Flex Ltd.,* 71 F.4th 1355, 2023 USPQ2d 737, at *4 (Fed. Cir. 2023) (citing *Palm Bay*, 73 USPQ2d at 1694). "The weaker [the cited] mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Palm Bay*, 73 USPQ2d at 1676 (internal citations omitted). This sixth *DuPont* factor allows a defendant to contract the scope of protection of a plaintiff's mark by adducing evidence of conceptual and commercial weakness. *Spireon*, 2023 USPQ2d at *4.

Applicant postulates that Opposer's mark is on the weaker end of the spectrum, making it entitled to only a narrow scope of protection because it contains the commonly used phrase "GOT TALENT." Applicant however did not make of record any admissible third-party registration or third-party marketplace use evidence. On this record, the sixth *DuPont* factor is neutral.

7. Balancing the *DuPont* Factors

The final step in analyzing likelihood of confusion is to weigh the *DuPont* factors for which there has been evidence and argument; "explain the results of that weighing;" and "the weight [we] assigned to the relevant factors." *In re Charger Ventures LLC*, 65 F.4th 1375, 2023 USPQ2d 451, at *7 (Fed. Cir. 2023).

The second and fifth *DuPont* factors each weigh heavily in favor of finding a likelihood of confusion. Under the first *DuPont* factor, the parties' marks are similar overall in sound, appearance, connotation and commercial impression. We keep in mind that where the services are identical, the degree of similarity between the marks necessary to support a determination that confusion is likely declines. *Bridgestone Americas Tire Operations, LLC v. Fed. Corp.,* 673 F.3d 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012). Opposer's mark enjoys a high degree of fame or commercial strength amongst the target consumers for its services, meaning that it is entitled to a broad scope of protection. The channels of trade, class of consumers and purchasing conditions also weigh in favor of finding a likelihood of confusion. The sixth factor is neutral.[38] We therefore conclude that confusion is likely.

Opposer has proved, by a preponderance of the evidence, its entitlement to a statutory cause of action, priority and likelihood of confusion.

**Decision**: Opposer's Section 2(d) claim is sustained.

---

[38] Opposer also argues that "the absence of actual confusion evidence is not relevant here and should not affect the analysis." Opposer's Brief, p. 29; 38 TTABVUE 30. Given the lack of evidence in the record concerning the seventh and eighth *DuPont* factors, we deem these factors neutral as well.